IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DR. MARK G. TURNER, DDS, PC, and )
DR. MARK G. TURNER, DDS in his )
Individual capacity, )
                                   )
            Plaintiffs, )
                                     )
v. ) Civil Action No. 3:17cv527–HEH
                                     )
VIRGINIA DEPARTMENT OF )
MEDICAL ASSISTANCE SERVICES, )
*et al.* )
                                     )
           Defendants. )

## MEMORANDUM OPINION
**(Granting Defendants' Motions to Dismiss; Denying Motion to Transfer as Moot)**

This matter is before the Court on three Motions to Dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6) and a Motion to Transfer Venue in accordance with 28

U.S.C. § 1404.[1] The Complaint contains one count alleging a violation of the Sherman

Act and several counts alleging violations of state law.

All parties have filed memoranda supporting their respective positions. The Court

will dispense with oral argument because the facts and legal contentions are adequately

presented in the materials before the Court, and oral argument would not aid in the

decisional process. E.D. Va. Local Civ. R. 7(J).

---

[1] Defendants Virginia Department of Medical Assistance Services ("DMAS") and Dr. Tonya Parris-Wilkins, DDS ("Parris-Wilkins") filed a joint motion on August 25, 2017. (DMAS, Parris-Wilkins Mot. to Dismiss, ECF No. 11.) Defendants Dr. David Black, DDS ("Black") and Dr. Terry Dickinson, DDS ("Dickinson") also filed a joint motion on August 25, 2017. (Black, Dickinson Mot. to Dismiss, ECF No. 9.) Defendant Dr. Greg Harvey, DDS ("Harvey") filed a Motion to Dismiss and a Motion to Transfer Venue on September 6, 2017. (Harvey, Mot. to Dismiss, ECF No. 17; Harvey, Mot. to Transfer, ECF No. 19.)

For the reasons stated herein, the Court will grant the Motions to Dismiss. Count One will be dismissed with prejudice. The remaining state law counts will be dismissed without prejudice. The Motion to Transfer Venue will be denied as moot.

## I. Background

As required by Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court assumes Plaintiff's well-pleaded allegations to be true and views all facts in the light most favorable to him. *T.G. Slater & Son v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citing *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). Viewed through this lens, the facts are as follows.

Plaintiff Dr. Mark G. Turner, DDS[2] ("Plaintiff") was a dentist in the Roanoke, Virginia area during the period relevant to the Complaint. (Compl. ¶ 1.) From 2008 to 2014, Plaintiff treated Medicaid patients in the Smiles for Children ("SFC") program pursuant to an agreement with Defendant Dentaquest, LLC.[3] (*Id.* ¶¶ 2–3.)

Defendant DMAS is the Virginia agency tasked with overseeing the SFC program and contracted Defendant Dentaquest to administer and supervise the program. (*Id.* ¶ 6.) DMAS is managed by the Secretary of Human Resources and a Director of Medical Assistance Services, who is appointed by the Governor and subject to confirmation by the General Assembly. Va. Code Ann. § 32.1-323. Additionally, DMAS has an eleven-member board ("DMAS Board"), which is comprised of five members who are health

---

[2] This action is brought by Plaintiff "both in his individual capacity and through his corporation that he did business" with. (Compl. ¶ 20.)

[3] Defendant Dentaquest is the successor of Doral Dental USA, LLC, which is the party with whom Plaintiff originally entered into an agreement. Defendant Dentaquest is not a party to the motions presently before the Court.

care providers and six members who are not health care providers. Va. Code Ann. §

32.1-324(A). The DMAS Board formulates and submits a plan for the provision of

medical assistance services to the U.S. Secretary of Health and Human Services in

accordance with Title XIX of the Social Security Act. Va. Code Ann. § 32.1-325(A).

The Director of Medical Assistance Services is empowered to administer this plan and to

"enter into all contracts necessary or incidental to the performance of the Department's

duties and execution of its powers as provided by law." Va. Code Ann. § 32.1-

325(D)(1).

The SFC program is split into two parts: one component of the program is

dedicated to treating patients up to the age of twenty one and the other component

focuses on treating patients that are over the age of twenty one. (*Id.* ¶ 4.) Plaintiff

"worked exclusively with the Over 21 portion" of the SFC program. (*Id.*) During his

involvement with the SFC program, Plaintiff operated what was likely "the largest safety

net adult Medicaid practice in Virginia" and "was treating at least 75% of the eligible

Medicaid adults receiving treatment in the Roanoke Valley." (*Id.* ¶ 10.) The patients

Plaintiff treated under the SFC program formed the entirety of his practice. (*Id.* ¶ 3.)

The Roanoke-based Mission of Mercy Clinic ("MOM") was a project of the

Virginia Dental Association ("VDA") that provided "free, volunteer traveling dental"

services to the same segment of the population as Plaintiff. (*Id.* ¶¶ 13–14.) Defendant

Dickinson, the Executive Director of the VDA, and Defendant Black, a VDA board

member, are Founders of MOM, and Defendant Black serves as its Dental Director. (*Id.*

¶¶ 13, 27.) Plaintiff claims that competition with the MOM was detrimental to his

practice, but he also credits his dental practice as a "contributing factor [to] the Roanoke Mission of Mercy going out of business." (*Id.* ¶ 42.) The MOM's financial model proved unworkable, and, sometime after September 2012, the program was reorganized into a Mini-MOM concept, which was "fully endorsed" by the VDA. (*Id.* ¶¶ 14, 42, 44.)

In January 2014, Defendant Dentaquest ended Plaintiff's eligibility under the SFC program by terminating Plaintiff's contract "without cause." (*Id.* ¶¶ 21, 45.) Starting in 2014, Commonwealth Dental Clinic ("CDC"), which is owned by Defendant Harvey, became the only "provider[] for Adult (Over 21) Medicaid dental services in Western Virginia." (*Id.* ¶ 66.)

Plaintiff alleges that the "defendant dentists exercised their market power to push the Plaintiff out of his dental market niche, and out of business" and that DMAS and Dentaquest "knew there was antitrust activity" and took action that led to "further cover up and concealment of Defendants' actions against [Plaintiff]." (*Id.* ¶¶ 18, 54–55.) Specifically, Plaintiff claims that, in downsizing from the financially inviable MOM, Defendants agreed to provide treatment to non-Medicaid-eligible patients at the Mini-MOMs and funnel all Medicaid-eligible patients to Defendant Harvey's CDC. (*Id.* ¶¶ 14, 18, 43.) Plaintiff further alleges that "Defendant Greg Harvey agreed to absorb the Over 21 Medicaid practice of Plaintiff on the condition that he would not have to compete directly with Plaintiff." (*Id.* ¶ 48.) As such, Plaintiff alleges that Defendants Dickinson, Black and Harvey "joined together . . . to put [Plaintiff] out of business in the Medicaid [SFC] program." (*Id.* ¶ 18.)

As mentioned above, Defendant Dentaquest terminated Plaintiff's contract, ending

his eligibility under the SFC program. (*Id.* ¶¶ 21, 45.) Plaintiff does not contend that Defendant Dentaquest lacked the contractual right to terminate his contract.[4] Instead, Plaintiff alleges that Defendant Dentaquest "did not act independently," that "DMAS sought the Plaintiff's termination based upon the advice of Defendants Terry Dickinson, David Black and/or Greg Harvey," and that Defendant Dentaquest notified Plaintiff's patients of his termination before the deadline for his appeal had passed. (*Id.* ¶¶ 45, 46, 61.)

Plaintiff alleges that Defendant Dickinson communicated the progress of Plaintiff's termination to Defendant Black; that Defendants Black and Harvey purchased a building to house CDC prior to Plaintiff's termination "*with the knowledge and intent* . . . that one of their main competitors ([Plaintiff]) would be eliminated by Defendant Dentaquest;" and that the VDA, led by Defendant Dickinson, supported the CDC despite "not support[ing] the Over 21 Benefit in the past." (*Id.* ¶¶ 24, 35, 47.)

In January 2015, Plaintiff filed an ethics complaint ("2015 complaint") against Defendants Harvey and Black with the VDA Ethics Committee regarding ethics violations surrounding the naming and advertising of CDC. (*Id.* ¶ 27; Exhibit D, ECF No. 1-4.) Plaintiff states that the VDA "likely did not conduct a review of [Plaintiff]'s Ethics Complaint, as, if they did, David Black would have been found blatantly guilty." (Compl. ¶ 27.) Further, Plaintiff alleges that Defendant Parris-Wilkins, a member of the VDA and the VDA Ethics Committee, "presumably" ruled against this complaint. (*Id.* ¶ 31.)

---

[4] Plaintiff's asserted cause of action in the fifth count of the Complaint indicates that Plaintiff's contract with Defendant Dentaquest was "terminable at will." (Compl. 31.)

In April 2016, Plaintiff was the subject of an inquiry by the Virginia Board of Dentistry ("BOD") and was ultimately sanctioned for violations stemming from the closure of his dental practice in 2014. (*Id.* ¶ 31; Exhibit N, ECF No. 1-17.) Defendant Parris-Wilkins was on the BOD panel that ruled against Plaintiff. (Compl. ¶ 31.) Plaintiff contends that Defendant Parris-Wilkins' service on this panel was a clear conflict of interest, due to her "close relationship" with Defendant Dickinson and her role in ruling against the 2015 complaint. (*Id.* ¶ 33.) In sum, Plaintiff claims that "Defendant Parris-Wilkins was involved in the Defendants' attempts to cover up their actions against Plaintiff." (*Id.*)

Plaintiff asserts a cause of action under Section One of the Sherman Act and alleges that the relevant service market is:

> (1) adult (over 21) dental services recognized under the Medicaid approved *Smiles For Children* program; (2) tooth extractions and related services, as identified under Medicaid approved Over 21 *Smiles For Children* program; and (3) Medicaid approved services for the Over 21 members of the *Smiles For Children* program in Western Virginia, and within a two hour drive of Roanoke, Virginia.

(*Id.* ¶ 56.) Plaintiff claims that, as a result of Defendants' anticompetitive actions, dentists have been deterred from entering the market and there has been a significant reduction in the availability of dental services. (*Id.* ¶ 64.) Further, CDC will continue to exercise its "influence" to maintain a "monopoly" over the market. (*Id.*) Plaintiff also claims that he has been "directly harmed" by Defendants' anticompetitive conduct and continues to suffer "significant economic and financial loss." (*Id.* ¶ 67.)

Plaintiff previously brought a nearly identical action against a nearly identical cast

of defendants in the United States District Court for the Western District of Virginia. *See Turner v. Va. Dep't of Med. Assistance Servs.*, 230 F. Supp.3d. 498 (W.D. Va. 2017) (hereinafter "Western District Case"). After considering Plaintiff's arguments, the Honorable Judge Jackson L. Kiser granted the defendants motions to dismiss and dismissed the action without prejudice.

## II.    Standard of Review

Generally, a court considering a motion to dismiss is both informed and constrained by the four corners of a complaint. The court, however, may properly consider documents that are attached to the complaint, Fed. R. Civ. P. 10(c), and take judicial notice of matters of public record, *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). The task at hand is to determine the sufficiency of the Complaint, "not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, plaintiff's well-pleaded allegations are taken as true and the complaint must be viewed in the light most favorable to the plaintiff. *T.G. Slater & Son, Inc.*, 385 F.3d at 841.

Nevertheless, "in the event of conflict between the bare allegations of the complaint and any exhibit attached . . . the exhibit prevails." *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991). The so-called exhibit-prevails rule is only applicable when a plaintiff relies on an exhibit to form part of its claim, such that a court can presume plaintiff "has adopted as true the contents of the document." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166–67 (4th Cir. 2016).

A court "need not accept the legal conclusions drawn from the facts," nor must the court "accept as true unwarranted inferences, unreasonable conclusions or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). To survive Rule 12(b)(6) scrutiny, a plaintiff must provide more than merely "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Instead, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level," stating a claim that is "plausible on its face," rather than merely "conceivable." *Id.* at 555, 570 (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

### III.   Discussion

Each of the Defendants that are parties to the Motions presently before the Court have challenged the sufficiency of the factual allegations made in Plaintiff's Complaint under the *Twombly* and *Iqbal* standard. In addition, Defendant DMAS argues that the doctrine of issue preclusion bars re-litigating Judge Kiser's determination that it is immune from liability for violations of the Sherman Act. Alternatively, Defendant DMAS argues that it is immune from liability under the Sherman Act for the same reasons enunciated in the Western District Case. Because the immunity determination would preclude liability regardless of the sufficiency of the factual allegations to state a claim under the Sherman Act, the Court will address the issue preclusion and state action

immunity arguments first.

## 1. Issue Preclusion

First and foremost, the Court may properly consider whether the doctrine of issue preclusion bars re-litigation of the immunity issue at this stage of litigation. The doctrine of issue preclusion, also known as collateral estoppel, is an affirmative defense. It is well-settled in the Fourth Circuit that a court ruling on a motion to dismiss may properly consider affirmative defenses when such defenses "clearly appear on the face of the complaint." *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993). Further, "a district court may properly 'take judicial notice of facts from a prior judicial proceeding when the [collateral estoppel] defense raises no disputed issue of fact.'" *Ashe v. PNC Fin. Servs. Grp.*, 652 F. App'x 155, 157 (4th Cir. 2016) (quoting *Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000)).

Plaintiff contends that "DMAS . . . may not invoke state-action immunity." (Compl. ¶ 70.) As discussed below, in making this claim, Plaintiff is attempting to re-litigate the determination in the Western District Case that DMAS is immune from this action. Because the question of issue preclusion clearly appears on the face of the Complaint, the Court can appropriately consider the preclusive effects of Judge Kiser's opinion in the present case.

The burden is on the party seeking the preclusive effect of a determination to show that issue preclusion is applicable. Issue preclusion is only appropriate when the proponent demonstrates:

(1) the issue or fact is identical to the one previously litigated; (2) the issue or fact

> was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding.

*Kloth v. Microsoft Corp.*, 355 F.3d 322, 326 (4th Cir. 2004). Plaintiff does not address the issue preclusion argument in his memorandum opposing DMAS's Motion. For the reasons below, the Court finds that issue preclusion does not apply.

The first, second, fourth and fifth elements are satisfied in the present case. The state action immunity issue presently before the Court is identical to the one decided by Judge Kiser in the Western District Case. *Turner*, 230 F. Supp.3d. at 505–07. Judge Kiser resolved the immunity issue, and his dismissal of Plaintiff's action against DMAS was based in part on that immunity determination. *Id.* at 507. Moreover, Plaintiff clearly had a full and fair opportunity to be heard, as the dismissal came after the court heard arguments from both parties. *Id.* at 505–07. Lastly, the dismissal operates as a final and valid order.

With regard to the third element, the Court must consider whether the determination that state action immunity applied to DMAS was critical and necessary to the dismissal of the complaint against DMAS. In *Ritter v. Mount St. Mary's College*, the Fourth Circuit found that "where the court in the prior suit has determined two issues, either of which could independently support the result, then neither determination is considered essential to the judgment. Thus, collateral estoppel will not obtain as to either determination." 814 F.2d 986, 993 (4th Cir. 1987); *see also Kloth*, 355 F.3d at 328. In pertinent part, Judge Kiser's opinion states: "Because DMAS has immunity against

10

claims under the Sherman Act, Plaintiff has failed to state a claim against DMAS."
*Turner*, 230 F. Supp. 3d at 507. While clearly relying on DMAS's immunity as one basis for his dismissal of Plaintiff's action against it, Judge Kiser went on to determine that dismissal was also warranted because Plaintiff failed to meet the plausibility standard under *Twombly* and *Iqbal*. *Turner*, 230 F. Supp. 3d at 508–09.

Because two independent reasons for dismissal of the claim against DMAS exist, collateral estoppel will not attach to the immunity determination from the Western District Case.

## 2. State Action Immunity

Defendant DMAS contends that the doctrine of state action immunity bars Plaintiff's claim against it for alleged violations of Section One of the Sherman Act. State action immunity, or *Parker* Immunity, makes clear that states are not bound by the strictures of the Sherman Act regime when operating in their sovereign capacity. *See Parker v. Brown*, 317 U.S. 341, 350–51 (1943). As described below, the state action immunity doctrine is applicable to DMAS, and therefore DMAS is exempt from liability under the Sherman Act.

In *Parker*, the Supreme Court found "nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by the legislature." *Id.* at 351. Subsequently, the Court adopted a two-part test to better establish the boundaries of this immunity. *See Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97 (1980). The Court clarified in *Midcal* that "a challenged restraint" is only immune from suit if it is "clearly

articulated and affirmatively expressed as state policy . . . [and that] policy must be actively supervised by the State itself." *Midcal*, 445 U.S. at 105. Importantly, however, the Court has carved out an exception to the active supervision component of the *Midcal* test. *See Hallie v. Eau Claire*, 471 U.S. 34 (1985). In *Hallie*, the Court held that municipalities are exempt from the active supervision requirement and suggested in dicta that state agencies are as well. 471 U.S. at 47. The Court explained that the motivation for this exemption is the limited concern that a municipality will engage in anticompetitive conduct based upon purely private interests. *Id.*

Most recently, the Court addressed the applicability of the active supervision requirement to state agencies in *North Carolina State Board of Dental Examiners v. FTC*. 135 S. Ct. 1101 (2015). The State of North Carolina entrusted the regulation of the practice of dentistry to the North Carolina State Board of Dental Examiners (the "Board"), and a majority of the Board's members were actively engaged in the practice of dentistry. *Id.* at 1107–08. The Board was sued after it sought to prevent non-dentists from providing teeth-whitening services. *Id.* The Court downplayed the significance of the names or labels supplied by the State and instead focused on the composition of the entity that allegedly engaged in anticompetitive conduct. *Id.* at 1114. Specifically, the Court held that an entity is subject to the active supervision requirement when "a controlling number of decisionmakers are active market participants in the occupation the board regulates." *Id.*

In order for DMAS to be protected by *Parker* Immunity, its actions must have been based upon a clearly articulated state policy and either actively supervised by the

state or exempted from the active supervision requirement.

DMAS was acting pursuant to a clearly articulated state policy when it directed Dentaquest to terminate its contract with Plaintiff. The clearly articulated policy standard is satisfied when "the displacement of competition is the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature." *N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1112 (internal citations omitted). The Code of Virginia authorizes DMAS to develop a plan for administering medical assistance services and further entrusts the Director of DMAS with the authority to enter into contracts that are "necessary or incidental" to DMAS performing the duties and executing the power it is invested with by law. Va. Code. Ann. § 32.1-325(A), (D)(1). Implicit in the authority to enter into contracts is the power to terminate them. Further, the displacement of some competition is the natural consequence of DMAS exercising its administrative authority.

Plaintiff does not appear to contest that the Commonwealth of Virginia has conferred this specific authority to DMAS or that the exercise of this authority would necessarily have an impact on the competitive market. Instead, he contends that Virginia has not articulated a clear policy allowing DMAS to engage in anticompetitive conduct. (*See* Compl. ¶¶ 52–54, 70.) As detailed above, however, there is no requirement that a state explicitly endorse the anticompetitive effects of a clearly articulated policy. Rather, those effects need only be the inherent, logical, or ordinary result of exercising the delegated authority. In this case, the exclusion or inclusion of various service providers is the obvious and foreseeable result of the exercise of the administrative authority that the Virginia General Assembly delegated to DMAS.

For these reasons, DMAS has satisfied the clearly articulated policy prong of the *Parker* Immunity analysis.

DMAS is not subject to the active supervision requirement. The primary mission of DMAS is the provision of medical assistance services and not the regulation or licensure of members of the dental profession. *See* Va. Code Ann. §§ 32.1-323, *et seq.* Moreover, DMAS is politically accountable. It is overseen by the Secretary of Human Resources and the Director of DMAS, who is appointed by the Governor and subject to confirmation by the General Assembly. To the extent the DMAS Board is relevant to the actions underlying this case, only a minority of its members are health care providers. *Cf. N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1114. Plainly put, the concern animating the Court's active supervision line of cases—that private actors cloaked in the authority of the state will subvert public priorities to private self-interest—is not present with DMAS, which functions as a prototypical state agency.

Plaintiff's arguments that DMAS requires active supervision are unavailing. Plaintiff essentially contends that in making its decision to terminate him DMAS relied on the opinions and suggestions of active market participants and therefore "ceased to maintain an objective approach to Plaintiff." (Compl. ¶ 55.) Conspicuously absent from the Complaint is any allegation that DMAS—the entity which ultimately made the decision to terminate Plaintiff—is controlled by market participants. Plaintiff instead alleges that DMAS "conspired" or "agreed" with the other Defendants to exclude him from the Medicaid market. (*See* Compl. ¶¶ 29, 59.) However, even if the Court were to accept these conclusory allegations as true, "[t]here is no such conspiracy exception" to

*Parker* Immunity. *City of Columbia v. Omni Outdoor Advert.*, 499 U.S. 365, 374–79 (1991); *see also N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1114.

DMAS operates as a prototypical state agency and is not controlled by active market participants, and therefore the active supervision component of the *Midcal* test is inapplicable. For these reasons, DMAS is immune from suit under the Sherman Act. Therefore, Plaintiff's claim against DMAS for violating Section 1 of the Sherman Act will be dismissed.

**3.      Failure to State a Claim for Violation of the Sherman Act**

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. "To establish a § 1 antitrust violation, a plaintiff must prove '(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint on trade.'" *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013) (quoting *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002)). Additionally, once a plaintiff demonstrates a violation of § 1, he must prove that he suffered an antitrust injury: the type of injury that "the anti-trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

At the outset, the Court notes that it is unclear how any of the individuals named as Defendants could have possibly excluded Plaintiff from the Over 21 SFC program. Plaintiff essentially contends that DMAS ordered Dentaquest to terminate its contract

with Plaintiff only after agreeing with Defendants Dickinson, Parris-Wilkins, Black and Harvey that Defendant Harvey would fill the gap created by Plaintiff's termination. It is undisputed, however, that Plaintiff's contract allowed for termination without cause. It is also undisputed that DMAS and Dentaquest were the only entity with the authority to terminate Plaintiff's contract. That the individual Defendants may have lobbied for Plaintiff's termination or even agreed with DMAS that Plaintiff should be removed from the Smiles for Children program does not change the fact that the power to exclude Plaintiff from the program rested with DMAS and Dentaquest. As the Court stated in *Omni*, "it is both inevitable and desirable that public officials [will] agree to do what one or another group of private citizens urges upon them." 499 U.S. at 374.

Also noticeably absent from the Complaint is any explanation as to how the individual Defendants could have conceivably excluded Plaintiff from the SFC program market wielding powers that they did not have. Plaintiff broadly claims that "[DMAS], Dentaquest . . . and the [i]ndividual Defendants have exercised the power to exclude dentists from competing in the relevant service markets. These Defendants have the power and perceived power to provide contracts, issue finds, and order dentists to take or refrain from certain conduct." (Compl. ¶ 58.) Plaintiff, however, provides no indication as to how or when the private individual Defendants exercised this authority. Further, the only allegation of misconduct against Defendant Parris-Wilkins occurred in April of 2016, more than two years after Plaintiff's contract with Dentaquest was terminated.

A. **Plaintiff Fails to Plausibly Allege a Contract, Combination or Conspiracy**

Because § 1 of the Sherman Act only restricts contracts, combinations and

conspiracies that restrain trade, the relevant inquiry "is whether the challenged

anticompetitive conduct "stem[s] from independent decisions or from an agreement, tacit

or express." *Twombly*, 550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film

Distrib. Corp.*, 346 U.S. 537, 540 (1954)). In *Twombly*, the Court clarified that mere

conclusory claims of an agreement, even when paired with allegations of parallel

conduct, are insufficient to satisfy the contract, combination or conspiracy aspect of a § 1

antitrust claim. 550 U.S. at 553–55. "Without *more*, parallel conduct does not suggest

conspiracy, and a conclusory allegation of agreement at some unidentified point does not

supply facts adequate to show illegality." *Id.* at 556–57 (emphasis added).

The Fourth Circuit has found that "[a]ntitrust complaints . . . 'that include detailed

factual allegations as to the who, what, when and where of the claimed antitrust

misconduct not surprisingly survive dismissal.'" *SD3, LLC v. Black & Decker (U.S.)

Inc.*, 801 F.3d 412, 430 (4th Cir. 2015) (quoting William Holmes & Melissa

Mangiaracina, Antitrust Law Handbook § 9:14 (2014 supp.). Communications between

alleged conspirators can help raise an inference of agreement, as they afford the "means

and opportunity to conspire." *Id.* at 432. In essence, additional details that indicate a

meeting of the minds are required to "allay[] suspicion that the plaintiff is merely

speculating a conspiracy into existence from coincidentally similar action." *Id.* at 430.

Plaintiff falls well short of alleging the requisite meeting of the minds. The

Complaint contains nothing more than conclusory allegations of an agreement between

the Defendants. Moreover, those allegations are directly controverted by several other

statements in the Complaint that allege DMAS sought the advice of the Defendants.

(*Compare* Compl. ¶ 29 ("Defendant Dr. Greg Harvey, DDS formed and funded CDC after agreeing with Defendants DMAS, Dickinson and Black that Plaintiff would be terminated from the Virginia Medicaid program."), *with* Compl. ¶ 55 ("DMAS sought the opinion of Defendant Dickinson in regard to the decision to terminate Plaintiff, and discussed this decision with Defendants Dickinson, Black and Harvey . . . [t]hus, DMAS ceased to maintain an objective approach to Plaintiff.").)[5] One party seeking the advice, opinion or consultation of another party as to a decision does not imply that the two entered into an agreement. This is no less true when the party seeking advice ultimately follows that advice.

Even if the Court were willing to disregard this glaring inconsistency in Plaintiff's Complaint, the remaining allegations do not provide the "more" necessary to satisfactorily allege a § 1 antitrust violation. The fact that Defendant Dickinson communicated with Defendant Black on the progress of Plaintiff's termination does not suggest that the two were working together to bring the termination about. The fact that Defendant Harvey had advanced knowledge of Plaintiff's termination and took steps to fill the gap created by his termination does not suggest that he was active in causing the termination. These examples at best represent parallel conduct which alone is not

---

[5] As evidence of the communication amongst the Defendants with regard to Plaintiff's termination, Plaintiff attaches Exhibit T. ("Ex. T," ECF No. 1-23.) This exhibit shows that Defendant Dickinson was in an email thread in which he was informed of Plaintiff's impending termination; however, the thread does not show him advising, encouraging, agreeing or otherwise ordering that the termination occur. Additionally, another email in the thread from a DMAS official reveals that Plaintiff was terminated due to concern that Plaintiff presented a "liability given his staffing situation, [and] 17 complaints in 5 years." (Ex. T at 5.) In accordance with the exhibit-prevails rule, it is likely that this statement can be relied on for its truth to the detriment of any contrary allegations in the Complaint. *See Goines*, 822 F.3d at 166–67. That said, given the clear deficiencies of Plaintiff's Sherman Act claims, the Court need not rely on this statement in its analysis.

actionable.

In its best light, the Complaint contains conclusory allegations of an agreement and a few instances of parallel conduct. Under *Twombly*, additional factual allegations are necessary in order to plausibly claim that an agreement was reached. Therefore, Plaintiff has failed to sufficiently allege a meeting of the minds.

## B.    Plaintiff Fails to Allege that He Suffered an Antitrust Injury

The requirement of demonstrating an antitrust injury stems from the enduring principle that antitrust laws were enacted for "the protection of *competition*, not *competitors*." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). As such, a plaintiff's injuries must be "of the type that the antitrust statute was intended to forestall." *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983). Not all harms that flow from an antitrust violation are compensable under the antitrust laws.

Though an injury may be "causally related to an antitrust violation, [it] nevertheless will not qualify as antitrust injury unless it is attributable to an anticompetitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (internal quotations omitted). In essence, "a plaintiff must show that the net effect of a challenged restraint is harmful to competition." *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002). Identifying an antitrust injury is a necessary component of demonstrating standing to bring an antitrust action. *Kloth v. Microsoft Corp.*, 444 F.3d 312, 323 (4th Cir. 2006).

Plaintiff's antitrust claim founders at the starting gate because he fails to allege an

antitrust injury. Plaintiff's loss of his "niche" practice due to the decision by DMAS to

terminate his contact and to contract with a replacement service provider is not the type

of injury that the antitrust laws were designed to prevent. The Complaint contains no

plausible allegations that this decision by DMAS will produce anticompetitive results in

the relevant market. Plaintiff's contention that his termination will serve as a deterrent to

others seeking to enter the market is a conclusion that is not tethered to any specific

factual allegations. Moreover, while DMAS's decision to remove Plaintiff as a service

provider may have had the effect of shutting him out of the Medicaid market, that is the

natural consequence of substituting one contractor for another. *Drs. Steuer & Latham,*

*P.A. v. Nat'l Med. Enters.*, 672 F. Supp. 1489, 1502 (D.S.C. 1987). "Merely changing

exclusive contractors, however, cannot constitute a violation of the antitrust laws." *Id.*

The core of Plaintiff's alleged injury is that he was previously able to provide service to

the vast majority of Medicaid eligible patients through his contract with Dentaquest; "he

may not now complain that someone else enjoys a similar position." *Shafi v. St. Francis*

*Hosp.*, Nos. 90-3107, 90-3117, 1991 U.S. App. LEXIS 15232, *10 (4th Cir. July 16,

1991).

Additionally, in *Brunswick* the Court made clear that a plaintiff cannot claim an

antitrust injury if his alleged loss would have resulted even without an antitrust violation.

429 U.S. 477, 488–89. In this case, Plaintiff's contract was terminable by either party

without cause. Plaintiff's alleged injury stems from the termination of his contract and

Defendant Harvey's practice filling the coverage gap created by his termination.

According to Plaintiff, this has had the effect of shutting him out of the relevant market.

But, because Plaintiff narrowly defines the relevant market as participation in the Over 21 SFC program, any termination by Dentaquest would have resulted in Plaintiff's exclusion from the relevant market. In essence, he is attempting to use the Sherman Act to make an end-run around his at-will contract. The antitrust laws were not created to protect against this type of injury.

Plaintiff failed to allege the requisite agreement to restrain trade and failed to demonstrate that he suffered an antitrust injury. As such, the Sherman Act claim will be dismissed with prejudice

### 4.    State Law Claims

In addition to his claim under the Sherman Act, Plaintiff alleges five counts under various state laws. The Court's original jurisdiction over this action stems from the presence of a federal question based upon the Sherman Act count. 28 U.S.C. § 1331. Now that the sole federal question presented in this case has been dismissed, the Court will decline to exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c). As such, the remaining state law counts will be dismissed without prejudice.

### IV.    Conclusion

For the foregoing reasons, the Complaint will be dismissed. Consequently, Defendant Harvey's Motion to Transfer Venue will be denied as moot.

The Court additionally notes that it gave serious consideration to imposing sanctions in this case. The protracted history of this litigation reveals that Plaintiff has had ample opportunity to have his Sherman Act claims heard. Rather than address the deficiencies identified with particularity by Judge Kiser, Plaintiff re-filed a nearly

identical Complaint in this District. The most substantive change by Plaintiff was the addition of Defendant Parris-Wilkins, whom he alleges engaged in a conspiracy that occurred more than two years before he alleges any conduct on her part.

Plaintiff's filings in Opposition to the Motions to Dismiss are similarly, if not more egregiously, inadequate. Plaintiff quite apparently copied wholesale from filings he made in the Western District Case, often with limited applicability. For instance, the second page of his Opposition to Defendants DMAS and Parris-Wilkins's Motion contains a paragraph that references a "First Amended Complaint" and the "Blue Ridge Defendants." Plaintiff has not defined any group of Defendants by that term in this case and the Complaint in this case has not been amended. Instead, this paragraph appears verbatim in a Response in Opposition to a Motion to Dismiss filed by Plaintiff in the Western District Case. (*See* Civil Case No. 4:16-cv-43 (W.D. Va. 2017), ECF No. 52.) Additionally, Defendants DMAS and Parris-Wilkins point out that several of the arguments advanced by Plaintiff's Opposition appear to stem from an entirely different case. (*See* Defendants DMAS and Parris-Wilkins Reply 3, n. 1, ECF No. 22.) And Plaintiff generally failed to address several of the points raised by all the Defendants.

In spite of these questionable tactics, the Court does not feel that imposing sanctions is appropriate at this time. However, subsequent filings by Plaintiff attempting to rehash this same claim against these same Defendants will be viewed by this Court as an attempt to harass and will not engender a favorable response. Plainly put, if Plaintiff again charts the same course he has in this case, his path will likely include penalties under Rule 11 of the Federal Rules of Civil Procedure.

An appropriate Order will accompany this Memorandum Opinion.

_____ /s/

Henry E. Hudson
United States District Judge

Date: **March 19, 2018**
Richmond, VA